STREATOR CATHEDRAL GLASS CO. et al. v. WIRE–GLASS CO. et al.

(Circuit Court of Appeals, Seventh Circuit. November 8, 1899.)

1. PATENTS—ANTICIPATION—WIRE-GLASS.

The Shuman patents, No. 483,021, for a process for making wire-glass, or glass plates having embedded therein wire or wire-gauze, and No. 483,-020, for a machine for carrying out such process, while not for pioneer inventions, the idea of making wire-glass having been known in the prior art, and notably disclosed in the English patent to Armstrong, were not anticipated by such patent, as the process of manufacture by the machine

therein described was not only different, but the machine was not successful in operation, and such glass was not known commercially until made by the Shuman process and machine. Such patents also *held* infringed by machines made in accordance with the Ryon patent, No. 521,570.

2. SAME—GROUNDS FOR SUSTAINING—SUCCESS OF THING PATENTED.

When the question of invention is doubtful, the presumption of validity arising from the granting of a patent, as well as the practical success of the thing patented, should be given due weight and consideration.

Woods, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

This was a bill in equity instituted by the Wire-Glass Company, and the American Glass-Manufacturing Company, as assignee and licensee, respectively, of two patents granted to one Frank Shuman in 1892,—one for a process of making wire-glass, and the other for a machine for embedding wire-netting in glass,—against the Streator Cathedral Glass Company and others, for the infringement of these patents. Both patents were granted September 20, 1892.

In his mechanical patent, No. 483,020, the patentee describes the object of his invention as being "to construct a machine for rolling what I term 'wire-glass'; that is, sheet glass having embedded in it wire or wire-gauze."

In his specification he says: "My invention is especially useful in making glass for skylights of buildings such as railroad depots, conservatories, etc., or it may be used (the wire being preferably thicker) for vault lights, pavements, floors, etc., the thickness of glass depending upon the use to which it is put."

His machine consists of a long table mounted on a furnace, and heated thereby, upon which the molten glass is rolled. The molten glass is poured upon this table, and is then pressed to the requisite thickness by a carriage having three rollers, the front one of which smooths out the molten glass after it is poured out upon the table, and prepares it for the reception of the wire-gauze, which is introduced immediately behind the front roller, and is pressed into the molten glass by the second roller. This is corrugated so as to press the wire-gauze into the molten glass at uneven depths, after which the third roller passes over the glass and covers up the openings made by the rib roller and wire, thus completing the rolling of the glass. The finished glass is then removed, with its plate, and placed in an annealing furnace.

The first two claims—the only ones alleged to be infringed—are as follows:

"(1) The combination, in a machine for manufacturing wire-glass, of the table upon which the molten glass is poured, a roller for smoothing out said molten glass, a carrier for the wire or wire-gauze, situated back of the smoothing roller, and a finishing roller for closing up openings in the glass made by the wire or wire-gauze, substantially as described.

"(2) The combination of the bed for the glass, the carriage, the first smoothing roller, a ribbed roller, and a finishing roller for smoothing the glass after the ribbed roller has passed over it, with a chute or guide for the wire, situated between the first roller and the ribbed roller, substantially as specified."

In his process patent, No. 483,021, he repeats substantially his method of introducing the wire into the molten glass, and claims as his invention:

"(1) The process herein described of making wire-glass, said process consisting in—First, preparing a sheet of molten glass; second, mounting thereon wire or wire-gauze; third, pressing said wire or wire-gauze into the glass; and, finally, closing the openings made by the wire, substantially as described.

"(2) The process herein described of making wire-glass, said process consisting in—First, rolling the glass into a sheet; second, placing upon the glass the wire or wire-gauze, impressing portions of the wire-gauze deeply into the glass, thus corrugating the same; and, finally, rolling the glass and embedding the wire therein, substantially as described."

The defense was: First, that his process was not patentable; and, second, that it was practically described before by Armstrong, an English inventor, in his specification of a patent for a machine for making wire glass, which was filed in the United States patent office in 1887, and that it had also been

substantially anticipated by several others. The defendants also insisted that their machine was not an infringement of the Shuman patent, in that, while they used rollers for smoothing out the glass, and smoothing it again after the introduction of the wire-gauze, they employed the common and ordinary devices long and well known by plate-glass makers; and, while they admit their use of a device for embedding the wire after it has been smoothed by a roller, this device, though serving the same purpose as the corrugated roller in the Shuman machine, not only does this work more effectively, but operates according to a different principle. This device is an axle of independently revolving disks separated by washers, not only obviating the difficulty of pushing the glass ahead and thinning the layer on which the wire has been fed, but actually inserting the wire in the glass.

The circuit court entered a decree in favor of the plaintiffs upon both patents, with the usual injunction, whereupon defendants appealed to this court.

S. P. McConnell and H. N. Ryon, for appellants.

Charles Howson and Lysander Hill, for appellee.

Before BROWN, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

BROWN, Circuit Justice (after stating the facts as above). 1. The object of this invention, as outlined in the specification, was to provide a practical method of introducing wire-netting into glass used for translucent roofing, such as skylights, court yards, conservatories, etc., as well as for vaults, pavements, and floor lights, or any similar places where strength is required, or where the sash is in such position that, if the glass should break, it would be liable to injure persons beneath it. "For instance," as stated in the specification, "if the glass is used in skylights in railway depots or train sheds, the wire embedded in the glass would prevent particles of glass from falling if it should crack, and at the same time the glass protects the wire netting from the action of gases, which corrode the wire."

Defendants attack the novelty of this invention, and introduce in support of their defense several patents, none of which require special mention except the English patent of April 19, 1887, to John Armstrong. The apparatus described by Armstrong consists of a long table, such as is commonly used for rolling glass, with a large roller, B, and a small roller, in front of which the wire-gauze is delivered from a spindle standing above the rollers. One end of the wire-gauze is rigidly attached to one end of the table, and as the carriage travels along the table the gauze is delivered in front of the small roller, which travels along the table, and presses the wire-work against the incandescent glass, and partly enters it, the hot glass coming through the meshes to the upper side. The glass with the wire partly inserted is thus drawn under the large roller by the motion of the carriage along the table, thereby pressing the glass out to its requisite thickness.

The testimony upon the subject of this patent is somewhat unsatisfactory. Though Shuman went to Europe in 1894, and visited the large plate-glass factories in England, Belgium, France, and Germany for the purpose of obtaining all the information he could regarding the state of the art of making wire-glass, he found none for sale anywhere, although every one of the glass works men-

tioned by him had made experiments towards making wire-glass for some years back. They were entirely unsuccessful in a commercial sense, however, and "I had no difficulty in disposing of my European wire-glass patents there." He does not appear, however, to have made inquiries for Armstrong, the patentee, though his address is given upon the face of his patent in a well-known street in London. Such expert testimony as there is upon the subject indicates that the Armstrong invention is not a practical one, and the fact that no wire-glass made by this machine was found upon the market, and that the patent was allowed by the patentee to expire in 1891 (when only four years old), through nonpayment of a renewal fee, required by British law, are cogent evidence that the patent was found to be inoperative or valueless.

Beyond this, there is a manifest difference in the mechanism of the two devices. In the Armstrong patent, one end of the sheet of wire-netting is fastened to the end of the table, the other end being wound around a spool suspended perpendicularly above the table. The progress of the roller from one end of the table to the other unwinds the spool, and delivers the netting in front of a smaller and secondary roller, against which the molten glass is banked up, without any effort to smooth the glass before the wire is delivered. It can scarcely be a matter of surprise that the wire-netting so delivered becomes so hot that it is unable to withstand the tension. Shuman, who experimented with it, states in this connection that he failed to produce a merchantable wire-glass of any kind with this machine. In operating the machine in the manner described in the specification:

"We found that the wire was made very hot by its contact with the molten glass, and could not stand the pull of the machine. It distorted, drew out into a thread, and in most cases broke. In the few cases where the wire was embedded in the glass it would be either on one side of the sheet or the other, and from the fact of being pulled in its white hot and weak condition the major portion of the sheet of the glass rolled had no wire in it at all. We rolled about thirty sheets, but failed to produce wire-glass."

Another witness—an expert—testifies to practically the same effect, and gave it as his opinion that the machine was utterly impracticable. There was no testimony to contradict this.

In the Shuman device a roller is employed to smooth the molten glass before it receives the wire, which is delivered from a chute immediately behind the first roller. The machine thus contains three rollers, the office of the first being to lay the glass of an even thickness; that of the second, which is preferably corrugated, to press the wire beneath the surface of the glass at greater or less depths according to the corrugations; and that of the third to close up the openings made by the ribbed roller and wire, and to leave the glass with a smooth upper surface. As the wire is dropped by the chute it is subject to no tension, and may be heated to a high temperature before delivery without the danger of the breaking or twisting encountered in the practical operation of the Armstrong patent.

In a copy of the Armstrong patent, certified by the commissioner of patents March 24, 1897, and introduced by the defendants, there

is a memorandum upon the drawings to the effect that the roller may have ribs to cut the glass through, or the table may be ribbed; but in a corrected copy, introduced by plaintiffs, and certified by the commissioner of patents January 17, 1898, and also by the English comptroller general of patents, no such memorandum appears. But, even if it did, it must be taken in connection with the specification, which states that "the large roller may be ribbed with large divisions to cut the glass nearly through if found necessary to make the sheets of smaller size by its action against the table; or the table may have ribs instead, for the same purpose." This was obviously something entirely different from the corrugations upon Shuman's second roller, which were designed not to cut the glass into divisions, but to press the wire-gauze to a greater or less depth beneath the surface.

While the Shuman patent may be an infringement upon that of Armstrong, we think the introduction of the third roller for the purpose of smoothing the glass to a uniform thickness before the wire is delivered, and the improvement in embedding the wire-netting in the molten glass by a corrugated roller, are such an advance upon the Armstrong device as to entitle Shuman to his patent. We acquiesce the more readily in this conclusion from the fact that his device met with an immediate success, and appears to have supplanted entirely the previously known methods of manufacturing wire-glass. This fact, though by no means decisive of novelty, may properly be considered. The Shuman patent was evidently the first practicable method of making wire-glass, and appears to have attracted a good deal of attention in this and other countries, and various medals were awarded to the inventor. Indeed, Ryon himself, the patentee of defendants' machine, visited complainants' manufactory in the spring of 1894, and endeavored to secure the right to use the Shuman machine.

Patent No. 521,570, granted December 25, 1894, to Francis M. Ryon, under which defendants are manufacturing, exhibits the same features of a roller for smoothing the glass, a corrugated roller for the introduction of the wire-netting into the molten glass, and a similar and almost identical method of unwinding the netting from a spool, and allowing it to fall immediately in front of the corrugated roller. The guiding and feeding device for delivering the wire is practically the same. The structural difference on which appellants appear to lay most stress is that between the ribbed roll of complainants' patent and what appellants call the "axle of disks" of their machine. The differences are, in brief, that defendants' axle of disks is not a solid ribbed roll, in which the ribs are integral with the roll, but consists of rotating disks strung on a stationary axle; and, second, that these disks are thinner than the ribs shown in complainants' drawings, and the spaces between said disks are wider than the spaces between the ribs as shown by complainants' drawings. But in point of fact both devices act with a rolling pressure upon the glass, and the wire-netting to be embedded therein, with the result of embedding the netting, and in doing so of forming longitudinal ribs and furrows in the glass.

While this patent, too, is probably an infringement upon Armstrong's, it manifestly contains the improvements which Shuman adopted for the more perfect working out of the Armstrong idea, and, we think, must be held an infringement. It is manifest on the face of the patent that the specification was prepared by one perfectly familiar with the Shuman invention, and that there is a studied effort throughout the patent to differentiate the alleged invention thereof from his.

2. But little need be said regarding the process patent, the claims of which are, as stated above, for a process consisting—First, of rolling the glass into a sheet; second, mounting thereon the wire or wire-gauze by means of the corrugated roller; and, finally, rolling the glass, and thus closing the openings made by the wire. Plaintiffs' experts describe the process as consisting essentially in preparing a smooth, homogeneous plate of glass upon a suitable hard and level surface. Upon this sheet of glass, while still in a hot and plastic condition, is placed wire gauze or netting, or simply wire. This wire or wire-netting is then pressed down into the glass, while it is still hot and plastic, by some suitable means. Finally, the openings left by the wire as it goes down into the glass are closed up, and their sides are welded together, and the surface of the plate is smoothed over by some means adapted to the purpose. This process may obviously be carried out by the mechanism described in the first patent, but other machines may be devised for the same purpose.

As it involves not merely the function of a mechanical device, but certain elemental action, we think it the proper subject of a process patent. It is, in fact, a series of acts performed with molten glass and wire-gauze, by which they are transformed into a separate manufacture, within the definition of a process patent in Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 514.

Prior to the Armstrong patent, the only method practiced for manufacturing wire-glass is disclosed in certain English patents, notably that granted to Lake in 1886, by which a layer of molten glass of half the thickness which the finished plate is to have is spread upon a table. Upon this layer is placed a network of iron wires, or the like, previously polished, the thickness of which wires varies according to circumstances. This network is then covered with a fresh layer of glass, over which the roller is passed. The finished product is thus formed of two distinct layers of molten glass with a network of wire between them. The difficulty seems to be that these two layers may weld or they may not, and in either case the glass which covers the wire-gauze on one side is not of the same original or continuous mass which covers it on the other. Other English patents to Newton, 1855, to Hyatt, 1871, and to Sievert, 1891, disclose certain modifications of this process; but all contain the underlying feature of two layers of molten glass with a sheet of wire-gauze sandwiched between them. They obviously differ from the process described by Shuman, and do not seem to have been put in practice, or to have met with success.

The Armstrong patent is the only one seriously insisted upon as

an anticipation of the Shuman process. If this be an anticipation, it is sufficient to defeat the Shuman patent. If not an anticipation, the others are not. It differs from the Shuman patent, as does the mechanical patent, chiefly in the fact of the omission of the first element of the two claims of the Shuman patent, namely, the preliminary preparation of the sheet of molten glass by the introduction of the third roller. In the Armstrong patent a mass of molten glass is dumped in a heap in front of the small roller, and, as the main roller is advanced, the small roller, having a mass of molten glass in front of it and beneath the taut wire-cloth, forces upward a bank of the glass against the wire-cloth and bulges the glass through the meshes of the cloth. All that the Armstrong patent says of the action of this small roller is that it presses the wire-work against the incandescent glass, and partly enters it, the hot glass coming through the meshes to the upper side. As this small roller does not form a sheet of glass, it cannot, even if corrugated, determine the depth to which the wire-net will be embedded in the plate. It cannot force the wire-cloth to a definite depth measured from the table, because as it advances it is gradually lowered, and its own distance from the table is constantly varying. In fact, it lacks the essential feature of the Shuman patent, of a preliminary roller smoothing out the molten glass so as to form a plate of uniform thickness in which the wire-netting is firmly embedded by the corrugated roller. It is difficult to see how, under the Armstrong process, the wire-netting can be thoroughly embedded in the molten glass to a depth beyond its own thickness. Certainly not to the extent to which it is forced in by the corrugated roller of the Shuman patent.

That this patent is infringed by the defendants is not seriously questioned. Indeed, the description in the Ryon patent is a practical description of the Shuman process:

"As the sheet is formed and passes under the first roller, the sheet of wire-netting which is attached to the spool, and which has previously been drawn to the table surface, is allowed to unwind from the spool, and, as the sheet of glass passes under the axle of disks, the disks force the wire-netting down into the soft glass about half way the thickness of the sheet. As the sheet passes under these disks, there are small creases and ridges on its surface, and it now passes under the second roller, B¹, which smooths it, and presses out all of the ridges caused by the action of the disks in the glass."

Upon the whole we are of opinion that both of these patents should be sustained, and the decree of the court below is therefore affirmed.

JENKINS, Circuit Judge (concurring). I agree to the affirmance of this decree. I have doubted whether that which Shuman accomplished was not the result merely of mechanical skill. The line of demarkation between invention and mechanical skill is not well defined, and is often, especially in this age of improvement, difficult to follow. In case of doubt the law has wisely required the consideration of certain facts outside the question of invention or mechanical skill to resolve the doubt. The patent itself is, in a restricted sense, prima facie evidence of novelty and invention. J.

J. Warren Co. v. Rosenblatt, 53 U. S. App. 234, 25 C. C. A. 625, and 80 Fed. 540; and, when the question of invention is doubtful, the presumption of validity should have due consideration. In such case, also, the success which has attended the patented thing ought not to be overlooked, and should be given due weight. It is true that the success may have resulted in large measure from the exercise of business energy and of liberal advertisement, but no enduring success could be attained unless the thing patented had merit. In the case in hand, Shuman cannot be regarded as a pioneer. Others, and notably Armstrong, had conceived the thought of wire-glass, and provided certain means for the manufacture; but they never achieved success, or pointed out any practical means for its accomplishment. There was no wire-glass in use or upon the market, either in Europe or in this country, when Shuman obtained his patent. Charging him, as we must, with knowledge of the prior art, he was not the first to conceive the idea of wire-glass, but was the first to make it possible. It is easy after the event to see how simple an act turned failure into success; but prior to the time of Shuman no mechanical skill had solved the problem, and, if we may credit the testimony of this record, those engaged in the art were diligently at work to accomplish that which only Shuman effected. He has given to the world a new, useful, and valuable product. He succeeded where all others failed. In such case, I think, the principle asserted by the supreme court in The Barbed-Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154, and similar cases should be applied:

"Under such circumstances courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success. In the law of patents it is the last step that wins."

WOODS, Circuit Judge (dissenting). The patents in suit were applied for on July 6, 1892, and issued on the 20th of September ensuing. An application was made at the same time for a patent on the wire-glass which the machine and process were designed to produce, but presumably was denied, since there is no evidence that it was granted, and the expert whose testimony is chiefly relied upon to support the patents granted concedes that the product, wire-glass, was not then new. The fact of that application having been made is important here as evidence that Shuman was either entirely ignorant of the prior art, and supposed himself to be the inventor of wired-glass of the kind in question, or was willing to seek a patent to which he knew himself not entitled. "During December, 1891, and January and February and also March and April, 1892," he testified, "after conceiving the idea of making wire-glass, we inquired among the glass dealers of Philadelphia and New York, and at two large glass works in Pittsburg, and found no wire-glass on the market in this country." It may or may not be fair to infer from this use of the plural that he had assistance in working out the conceptions for which he sought patents, but it is noteworthy that in his applications for patents no reference was made to the prior art, and his testimony contains nothing concerning his knowl-

edge thereof, or concerning the circumstances or the manner of the making of his supposed discoveries. A statement of the circumstances, and especially of his knowledge of the prior art, it is evident, might throw much light upon the questions whether his conceptions were original, and were of an inventive character, or were the result only of mechanical skill applied to the improvement of prior processes and devices. The earlier patents on mechanism or processes for making wire-glass were foreign,—mainly English, —and it is fair to assume that, if he did not know of them sooner, they were brought to his knowledge by the report of the Franklin Institute of November 1, 1893, on which he was awarded "the John Scott legacy premium and medal, for his machine and process for producing wire-glass," as set forth in his letters patent. That report contained summary statements and explanations of the British patents to Newton, Hyatt, Lake, Armstrong, and Sievert, and also of certain French, German, and United States patents; of which those issued in this country manifestly have little relevancy to the art of making plate-glass. Of the Armstrong patent it was said:

"The patent of Armstrong * * * appears to come nearer to the practical solution of the problem than any which preceded those of Shuman. In Armstrong's case a clever attempt is made to realize practically the plan of pressing a wire-netting, by means of a heavy roller, into the body of a sheet of glass, and then covering the wire up in the glass by a pressure of the second roller following up the first one. The mechanism by which it is attempted to carry out this idea, though embodying the elements of a useful invention, was seriously defective, and the inventor does not appear to have made any effort to improve it."

Whether Armstrong made any effort to improve his invention is a question concerning which there is no evidence in the record, and probably nothing was known to the committee of the institute, but their report is important, because it affords an explanation, not otherwise furnished, of the experiments which, six months later, Shuman made for the purpose of testing the Armstrong machine. His testimony is that during May and June, 1894, he supervised the construction of a machine according to the specification of the Armstrong patent, and attempted therewith to manufacture wire-glass "according to the description of the specification, but failed to produce a merchantable wire-glass of any kind with said machine. In operating the machine in the manner described in the specification, we found that the wire was made very hot by its contact with the molten glass, and could not stand the pull of the machine. It distorted, drew out into a thread, and in most cases broke. In the few places where the wire was embedded in the glass it would be either on one side of the sheet or the other, and from the fact of being pulled in its white hot and weak condition the major portion of the sheet of glass rolled had no wire in it at all. We rolled about thirty sheets, but failed to produce wire-glass." This testimony is corroborated only by the superintendent of the glass works, who assisted in making the experiments. Shuman evidently believed or feared that the validity of his own patents depended upon showing that Armstrong's was a failure. His wish, if not his purpose, was to demonstrate a failure. Complete corrobo-

ration of his testimony, if true, could have been preserved and produced. Disinterested and skilled witnesses should have been called to observe the experiments, and competent mechanics to make them. The machine should have been preserved, and photographs and other indubitable evidence adduced that it was properly constructed and skillfully and honestly operated. Specimens of the product also should have been preserved, and produced in evidence. But none of these things are shown to have been done, and no excuse or explanation of the failure has been offered. Not even the names have been given of the mechanics who constructed and operated the machine, or of any witness, except the superintendent, who saw it operated, or examined the product. The only defect found in the operation of the machine was "that the wire was made very hot by its contact with the molten glass," and that may have resulted from the overheating of the glass, or from needless slowness of operation; but, in any event, the trouble was manifestly avoidable by causing the wire-netting to pass down immediately in front of the rear roller, or by leveling the molten mass in front of the small roller by means of a bar or other instrument properly adjusted for the purpose. The expert, Dayton, speaking with reference to Shuman's testimony on the subject, said: "The result there stated accords with the judgment which I had previously formed as to the practical inoperativeness of the Armstrong machine;" and while he added that he did not see how the machine could be changed to give any other than an unsuccessful result "so long as the scheme, plan, theory, and principle of the machine shall be preserved," it is evident that a mechanic of even ordinary skill, not compelled to concern himself about the exact "scheme, plan, theory, and principle of the machine," could easily have made the alteration necessary to prevent the overheating of the wire by its contact with the molten glass, and the consequent distortion and breaking of the wire. It could have been done without alteration of the machine; only a change in the method of use by passing the wire-netting in front of the second, instead of the first, roller was needed; and if a skillful mechanic could not have perceived at once the possibility of obviating, in either of the modes suggested, the obstacles to the successful operation of the device, then mechanical skill is only a name for stupid incompetence and inefficiency. And if the fastening of the wire to the end of the table tended to enhance the tearing and distortion described, it certainly required no invention to omit the fastening, which, it is to be observed, is no part of the Armstrong machine. It is only a suggestion in the specification touching the process or manner of using the machine. Another expert, after explaining that the lateral position of very hot wire will vary irregularly, concluded, with seeming emphasis: "And this irregularity appears to be utterly uncontrollable in the apparatus as shown." That an effect will remain unless the cause be removed hardly needed to have been said. It was more important that the witness should have expressed his opinion whether the apparatus might readily be changed so as to correct the irregularity.

Recalled in rebuttal, Shuman testified:

"In 1894 I was sent to Europe for the purpose of disposing of my European patents to some of the glass makers over there. In the course of my travels I visited most of the large glass works in England, Belgium, France, and Germany,—among others, the works of Pilkington Bros., at St. Helens, England; the St. Gobain Works at Paris, France; and the works of the Societe Anonyme des Glaces at Charleroi, in Belgium; and others, the names of which I cannot at present recall. * * * I made special efforts during my travels to find out all about the state of the art in making wire-glass, and whether any was on the market. I found no wire-glass for sale anywhere, although every one of the glass works mentioned had made experiments towards making wire-glass for some years back. They were entirely unsuccessful in a commercial sense, and I had no difficulty in disposing of my European wire-glass patents there."

This, so far as material, is hearsay, and not competent evidence. Was that journey abroad before or after the construction and experimental use of the Armstrong machine? It is not shown. What were the experiments that had been made, and what were the causes of failure? Were the experiments original and independent, or were they made in the direction of the patents to Newton, Hyatt, Lake, and Sievert, and especially were they made with a knowledge and according to the specification of the Armstrong patent? These questions unanswered, there can be, in my opinion, no justification for finding in the fact that the Armstrong patent expired in 1891 through nonpayment of the renewal fee, or in any circumstance mentioned, "cogent evidence that the patent was found to be valueless and inoperative." Excepting the experiments made under Shuman's supervision, no test of the value or operativeness of that machine seems to have been made, and there is no evidence that experiments "towards making wire-glass" were attempted by competent men, possessed of an adequate knowledge of the prior art. Armstrong's patent was in force for four years. It was confessedly a clever attempt,—the first attempt in a direction which Shuman followed,—and, as the experts of the Franklin Institute were able to see without the aid of experiments, came "nearer to the practical solution of the problem than any which preceded." Why did not Armstrong keep his patent alive, and demonstrate its value? In the absence of evidence on the point, a number of inferences are possible, and quite as justifiable as that stated. He may have died, have been in ill health, or unable to pay the renewal fee; or, good as his conception was, he may have been absorbed in other things, and may not have suspected the possibilities of his invention. He was in advance of the market, and doubtless the publication of his patent tended to create for wire-glass the strenuous demand which, within a year after its lapse, gave assured success to the efforts of Shuman. That success, attributable primarily to the merits of wire-glass, and not to the means or manner of producing it, is amply accounted for by extensive advertising, by the sudden demand, for which there was no other supply, and by other causes, and therefore affords no ground for a more ready conclusion that the Shuman patents, which confessedly infringe the patent of Armstrong, contain patentable improvements because of the introduction of the third

roller for smoothing the glass to a uniform thickness before the wire is delivered and the corrugated roller for embedding the wire-netting in the molten mass.

Extrinsic and unessential considerations aside, what is the case on its merits? The art of making plate-glass was already well known, and the object which Armstrong proposed to accomplish was simply an addition to that art, stated in the specification of his patent to be "to insert wire-work into the interior of sheets of glass while being rolled," and this he proposed to do by adding to the rolling table and the single roller already in use for rolling plate glass another small roller, with an apparatus for carrying it and a bundle of wire wound upon another roller, supported above, from which it should be delivered beneath the rollers below as they should pass over the molten metal on the table. The device is illustrated by the following cut:

The following cut presents a corresponding view of the Shuman device:

97 F.—61

The Walsh patent, No. 346,695, issued in 1886, and the Gray patent, No. 510,378, issued in 1893, disregarding special improvements therein claimed, afford good illustrations, according to the testimony of the expert Dayton, of the ordinary apparatus and method employed for many years in making 'what is known as "rough" or "ribbed" plate-glass; the "rough" being plain glass, without polish, as it comes from the machine, and the "ribbed" being the plate as it comes from a machine provided with a ribbed surface or surfaces, either of table or roller. The roller rests upon metal strips called "strangs," which, lying on the table, determine the thickness of the plate, the width being determined by the "gun," which is a detachable device, composed of parallel plates connected · to each other by crossbars, which hold them a suitable distance apart to receive one or more ladlefuls of molten glass between them. The gun slides along in front of the roller as the latter is turned by the operators by hand through the medium of the pilot wheels, and simultaneously is made to advance by means of the cogwheels and racks. In the use of the machine thus described the roller is brought into position at one end of the table, the gun is placed in front of it, and the mass of molten glass is dumped upon the table within the gun and in front of the roller. The mass retains measurably the form of the ladle, but settles or flattens slowly. The roller is at once advanced against this mass of glass, and over such portion of it as the roller will accommodate beneath it. As the roller advances, the plate is formed; first with a narrow rounded end, until the glass has spread out to the width of the gun.

It is obvious, as suggested by Dayton, that no gun can be employed with Armstrong's apparatus, if arranged and operated in precise conformity with the specification of the patent, because the roller, D, continually changes its distance from the table, and because that roller stands in the way of a gun in front of the rear roller; but the inclined tracks, F, which cause the continual change in the distance of the roller, D, from the table are adjustable, and, without change in the construction of the device, may be made horizontal, causing a horizontal movement of the roller, D, and so admitting of the use, if found desirable, of a gun in front of it. Another roller or bar might be adjusted in front of D, and the gun introduced in front of that. The gun being already a well-known adjunct of such devices, there could be no invention in introducing it into the Armstrong machine. The old machines were readily adjustable for the making of plates of different thicknesses, and it therefore seems entirely probable that they might have been employed for the production of wire-glass by first rolling a sheet of one-half the thickness desired, placing thereon the wire-netting, and then rolling thereon another sheet in time to fuse with the first. That would have been according to the "sandwich process," so called, of the patents of Newton, Hyatt, and others; but only for its bearing upon the devices of Armstrong and Shuman need the old art of making ordinary plate-glass be considered here. In that art the roller, both smooth and ribbed, was familiar, and mani-

festly it could not have been invention to employ a second or third roller, one to follow another, whether moved separately or so framed together as to be controlled by a single force. It could not, therefore, have been a feature of novelty and invention to introduce a second or third roller into the old machine for the purpose of adapting it to the introduction of wire-netting into the product; or, if that was invention, Armstrong is entitled to the credit of introducing the second roller, and it was certainly not a patentable novelty thereafter, on the part of Shuman, to introduce a third roller for the same or like purpose. Indeed, there is in evidence a specimen of wire-glass, designated "Dayton's Specimen A," which was made on the Shuman machine by taking the plate "from behind the corrugated roller, and after the impression [embedding] of the wire-netting, but before being flattened and welded by the rearmost roller of that apparatus, the machine having been stopped before completing the sheet to afford this sample." That sample bears some analogy to the design shown in the patent of Sievert. It is a plate of embossed glass, evidently merchantable, in which the embedded wire seems to be well covered, even at the places of deepest impression. It is an article which, though it did not pass under the third roller, is certainly within the process of the patent. It needed no invention to produce it without using the third roller, and, by the same reasoning, no change in the Armstrong device being necessary for the purpose, it could have involved no invention to pass the wire-netting under the second, or large, roller thereof only, which, as already explained, would have obviated the contact of the wire with a molten mass of metal in front, and, the large roller of that device having but two, or at most a small number, of ribs, the product would be less embossed, and, to that extent, better, than the specimen in evidence. Dayton, if present at the experiments with the Armstrong machine, could not have failed to perceive, and, presumably, would have verified, this possibility. And when, in the Armstrong machine, the plate had been passed under the large roller with its two or three ribs, it would not have been outside of the known art or of ordinary skill to close up the openings made by the ribs by means of another roller following the first. But it is said, or implied, that Armstrong's ribbed roller does not anticipate the ribbed roller of Shuman, because of the statement in Armstrong's specification that "the large roller may be ribbed with large divisions to cut the glass nearly through, if found necessary, to make the sheets of smaller size," etc. This ignores the doctrine of double use. It is clear beyond question that a sheet of taut wire laid upon a sheet or layer of molten metal, and passed therewith under a roller ribbed at each end, would thereby be embedded in the metal as it passed between the ribs, and, if a third rib, or more, between the others, were added, the embedding would be correspondingly more nearly uniform and complete. The ribs on the Armstrong roller and upon that of Shuman necessarily were effective to embed the wire in the passing sheet of metal, and it is not material that Armstrong did not mention that obvious

result. The ribbed roller or table was already familiar in the plate-glass art, and in itself an impossible feature of novelty in the modifications made of the old mechanism for the purpose of introducing wire into the product. Whether the memoranda upon the drawings of the Armstrong patent were put there at one time or another is manifestly an immaterial question. The body of the specification contains enough on the subject, if anything at all was necessary when ribbed rollers were well known.

The experts against him are agreed in condemning Armstrong because he "sought to take a quick cut to the end by passing the wire into the unformed glass, and then rolling it into a sheet"; while they point out that the 'process of Shuman consists in four steps: "First, preparing a sheet of molten glass, which is rolled to a definite predetermined width and thickness; second, mounting or placing thereon wire-gauze, smoothly, evenly, and in a definite position; third, pressing the said wire-gauze or wire into the glass definitely into a predetermined depth; and, finally, closing over the glass and smoothing and finishing the plate to a definite predetermined thickness." This is an attempt to give importance to distinctions which at most are improvements merely of form, and have no bearing upon the question of invention. When the "quick cut to the end" has been devised, it is not invention to construct a longer way out of the old materials, and over familiar ground. Especial stress, however, is laid upon the first step of Shuman,— the preparing of a sheet of molten metal on which to place the wire-gauze; but that is just what was done in the old art of making plate-glass. The first roller of Armstrong prepares such a sheet, and when it was found necessary to prevent the contact of the gauze with the piled-up metal in front of that roller it needed no new conception or extraordinary intelligence to place another roller, or bar, in position to smooth down the mass in front of the first roller. In the Shuman device and process, as I see them, there is nothing which is not embodied and clearly revealed in the patent to Armstrong, when intelligently considered in the light of the prior art, and I cannot agree that either of the patents in suit is valid. "In the law of patents it is the last step that wins," if it be an act of invention, but certainly not if it be an obvious correction of the defects of a known mechanism.