WESTERN GLASS CO. v. SCHMERTZ WIRE-GLASS CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1911.)

Nos. 1,682 and 1,683.

1. PATENTS (§ 283*)—SUIT FOR INFRINGEMENT—DEFENSES.

A patent procured by fraud and collusion, or by illegal procedure, either in the Patent Office or in a suit to procure its issuance under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), can be attacked only by the government, and such matters cannot be set up as a defense in a suit for infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–452; Dec. Dig. § 283.*]

2. PATENTS (§ 328*)—PRIORITY OF INVENTION—PROCESS AND APPARATUS FOR MAKING WIRE-GLASS.

The Schmertz patents, reissue No. 12,443 (original No. 791,216) and 791,217, each for a process and apparatus for making wire-glass, are not invalid for priority of invention by Appert, to whom a French patent was issued January 12, 1894.

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS AND APPARATUS FOR MAKING WIRE-GLASS.

The Schmertz patents, reissue No. 12,443 (original No. 791,216) and No. 791,217, each for a process and apparatus for making wire-glass, were not anticipated, and, while not of a pioneer character, disclose invention of a high order. Claims 1, 2, 6, and 7 of the reissue patent, which are broad claims, are infringed by the process and apparatus of the Jungers patent No. 867,510, in which the wire is fed positively and under both longitudinal and lateral tension between the two successively rolled layers of glass; but patent No. 791,217 is not so infringed, each of its claims being limited to a "by-gravity" feed.

Appeals from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Two suits in equity by the Schmertz Wire-Glass Company and the Mississippi Wire Glass Company against the Western Glass Company. Decrees for complainants (178 Fed. 977), and defendant appeals. Affirmed in one case, and reversed in one case.

These companion cases were tried together in the Circuit Court. The subject-matter in each is a Schmertz patent for process and apparatus for making wire-glass. Appellees are, respectively, owner and licensee. From decrees holding the patents valid and infringed these appeals are taken.

Schmertz's first application was filed on March 19, 1895; his second on April 1, 1895. While pending contemporaneously they were thrown into interference with Appert's application, based on his French patent which was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

published on January 12, 1894. The interference litigation ended in a decree of the Circuit Court for the Western District of Pennsylvania ordering the issuance of the Schmertz patents. 144 Fed. 117. They were issued on May 30, 1905, as Nos. 791,216 and 791,217.

The drawings and description of No. 791,216 portray a table, a leading roll held by rack rails and by pinions on the roll at a fixed distance above the table, a chute down which wire may be fed in advance of the leading roll, and a second roll held at twice the distance of the leading roll above the table. The process is thus stated:

"The operation of the device is as follows: A ladleful or suitable amount of glass is poured upon the table in advance of the leading roll and the leading roll moved forward. In practice the leading end of the sheet thus formed is discarded as made of chilled glass, and the introduction of the wire is not commenced until about eighteen inches of sheet has been developed. At this point the wire is fed into the hot glass in advance of the leading roller, passes beneath the same, and emerges at the rear side of the leading roll, pressed slightly into the top surface of a sheet one-eighth inch in thickness or pressed more deeply into the body if the leading roll is corrugated. As the forward end of the sheet moves near the rear roller a second casting is made upon the forward or dead end, so that the imperfect ends of the two sheets may coincide, and thus economize material. The rear roller advancing crushes down this second casting and forces the same over the wire-gauze, firmly welding the material in the second casting to the wire-gauze and the first sheet and forming a brilliantly polished top surface to the product, leaving the wire substantially in the center of the finished sheet, whose thickness will be the height of the rear roller above the bed of the table. The top sheet having only one roller traversing it will not become so chilled as where two or more rollers pass over it and especially where one is a corrugated roll throwing the glass up in ridges."

The apparatus of No. 791,217 is pictured and described in the same terms, except that the chute is shown to be behind the leading roll, and the process is recited in the same words, except that the feeding of wire is prescribed to be "post-roll" instead of "pre-roll."

Appert showed the same table and two rolls. His wire was fed by fastening one end of the web to the rear end of the table at an equal height with the bottom of the leading roll above the face of the table, then passing the wire under the second roll, under the leading roll, and thence up over a tension roll. Thus the wire by tension was held above the table at a distance that would bring it at the center of the finished sheet. Of the process Appert's specification says: "It is characterized by the continuous and progressive formation of two layers of molten glass and the simultaneous introduction between them of the metallic trellis or network and the compression of the whole into a solid, uniform, and homogeneous body or sheet. The simultaneous formation of the two layers with the fabric inclosed between them and the progressive formation of the complete product makes my invention practical, successful, and economical."

The process claims that were declared to interfere were the following:

Appert's claim 1: "The process of making sheets of glass with a metallic trellis imbedded therein, said process consisting in pouring and rolling out a layer of glass, simultaneously applying the trellis to the surface thereof, pouring a second layer of glass upon the trellis and rolling the same, the operation being carried on progressively, substantially as described."

Schmertz's claims 4 and 5 of No. 791,216:

"4. An improvement in the process of manufacturing wire-glass which consists in rolling a sheet of glass of less thickness than the ultimate product required: simultaneously forcing wire upon said sheet and forming a second sheet of glass upon said first sheet.

"5. An improvement in the process of manufacturing wire-glass which consists in rolling a sheet of glass of about half the ultimate thickness required; simultaneously with the formation of said sheet forcing the wire in said sheet and forming a second sheet upon said first sheet."

Schmertz's claims 3 and 4 of No. 791,217:

"3. An improvement in the process of manufacturing wire-glass which consists in rolling a sheet of glass of less thickness than the ultimate product required; simultaneously feeding by gravity wire upon the top of said sheet at the rear of the leading roll and rolling a second sheet of glass upon said original sheet and the wire, simultaneously imbedding the wire and finishing the sheet.

"4. An improvement in the process of manufacturing wire-glass which consists in rolling a sheet of glass of about half the ultimate thickness required; simultaneously feeding by gravity wire upon the top of said sheet at the rear of the leading roll and rolling a second sheet of glass upon said original sheet and the wire, simultaneously imbedding the wire and finishing the sheet."

There were also apparatus claims in each of the three applications corresponding appropriately to the process claims.

The Patent Office framed the interference issues in these words:

"1. The process of making glass sheets with wire inclosed therein, consisting in simultaneously forming a layer of glass and introducing wire thereto, and completing the sheet by forming another layer upon the first layer of glass; the process being carried on progressively.

"2. An apparatus for making sheets of glass with wire inclosed therein. consisting, of a table, a leading roll to roll a layer of glass, means to support and introduce wire to the said layer, a second roll, behind the leading roll, to form a layer of glass on the first or underneath layer, the periphery of the second roll being higher above the table than that of the leading roll, and the two rolls being far enough apart to allow the glass for the second or upper layer to be poured between them."

The Schmertz patents were issued without change in the specifications, and contained only the claims framed by Schmertz. In due season a reissue was sought of the patent based on Schmertz's elder application. In the reissue (No. 12,443, January 30, 1906) the specification was amended by inserting the following:

"Desiring to correct by reissue the accident and mistake whereby claims constituting the issues of a certain interference and covering broadly the invention common to the patents of Schmertz, No. 791,216 and No. 791,217. and the patent of Leon Appert, No. 608,096. were omitted from the specification of said patent No. 791,216, what is claimed is— ." And the above-quoted interference issues were incorporated as claims 1 and 2.

Appeal No. 1,682 involves patent No. 791,217. Infringement of all four claims is asserted. Claims 3 and 4 have been recited. Claims 1 and 2 are as follows:

"1. In the manufacture of wire-glass, the combination of a table; a leading roll; a second finishing roll and means for introducing the wire by gravity between said leading and finishing rolls.

"2. In the manufacture of wire-glass, the combination of a table; a leading roll with recessed ends; a finishing roll whose body is higher from the bed of the table than the body of the leading roll and means for introducing the wire by gravity between said leading and finishing rolls."

Appeal No. 1,683 involves the reissued patent. Infringement of claims 1, 2, 6, and 7 is asserted. Claims 1 and 2 have been recited as being the interference issues. Claims 6 and 7 are identical with the Schmertz written claims 4 and 5 of his elder application which were put into interference.

Assignments of error allege (1) illegality in the issuance of the patents; (2) Appert was the original and first inventor; (3) abandonment of the Schmertz applications; (4) anticipation; (5) want of invention; (6) noninfringement; and (7) unpatentability of the process.

The further facts, so far as they are deemed necessary, are stated in the opinion.

Charles K. Offield and Albert H. Graves, for appellant.

Arthur J. Baldwin and Drury W. Cooper, for appellees.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). 1. In Appert v. Brownsville Co. (C. C.) 144 Fed. 117, and in Schmertz Wire-Glass Co. v. Pittsburgh Plate Glass Co. (C. C.) 168 Fed. 73, the history of the issuance of the Schmertz patents in obedience to an order of the Circuit Court for the Western District of Pennsylvania in a proceeding under section 4915, Rev. St. (U. S. Comp. St. 1901, p. 3392), is given. Appellant, a stranger to the proceeding and not entering the wire-glass field until a considerable time after the patents were issued, contends that irregularities, and alleged omissions in procedure, and collusion between parties resulting in imposition on the court, render the order and the consequent issuance of the patents void. Circuit Judge Buffington, who made the order, has found against the contention twice. In the record before us we are inclined to think there is nothing that should lead us to find otherwise. But we do not rest upon this ground, for we believe that appellant is not entitled to present the assignment. Gandy v. Marble, 122 U. S. 432, 7 Sup. Ct. 1290, 30 L. Ed. 1223, decides that a proceeding under section 4915 "is in fact and necessarily a part of the application for a patent." A patent is the government's signed and sealed grant of a monopoly. Under the Constitution, Congress could have provided for the grant of monopolies to inventors against which the citizen could set up no defenses. Congress named certain permissible defenses, of which fraud and collusion in following the application to issuance is not one. Therefore a patent procured by fraud and collusion or by illegal procedure can be attacked only by the government. Mowry v. Whitney, 14 Wall. 439, 20 L. Ed. 858; Mahn v. Harwood, 112 U. S. 354, 5 Sup. Ct. 174, 6 Sup. Ct. 451, 28 L. Ed. 665; Ry. Register Mfg. Co. v. North Hudson C. R. Co. (C. C.) 23 Fed. 593; U. S. v. Am. Bell Telephone Co., 128 U. S. 315, 9 Sup. Ct. 90, 32 L. Ed. 450; Id., 159 U. S. 555, 16 Sup. Ct. 69, 40 L. Ed. 255; Id., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144.

2. In the course of the interference proceedings Appert was awarded priority twice; Schmertz, three times. Since the Schmertz patents issued, the defense that Appert was prior has been made in court at least six times, and there has never been a denial of Schmertz's priority. Even if it were permissible to ascribe to Appert an earlier date than January 12, 1894, when his French patent issued (section 4923 [page 3396]; Parker v. Appert, 75 Off. Gaz. 1201), appellant would fail. The evidence satisfies us that in the summer of 1893 Schmertz had fully conceived, made drawings of, and disclosed, his invention. This was before Appert ever thought of the matter, so far as the record shows. Prior to January 12, 1894, Schmertz was engaged in making a machine with which to practice his invention, and on January 16, 1894, he produced merchantable wire-glass.

3. There is a distinction between abandonment of an invention and abandonment of an application. Western Electric Co. v. Sperry Co., 58 Fed. 186, 7 C. C. A. 164. Abandonment of the invention was not pleaded. Abandonment of an invention being a question of intent (International Co. v. Kellogg Co., 171 Fed. 651, 96 C. C. A. 395), appellant, if it had pleaded the defense, would have had the burden of proving clearly that Schmertz and his successors in interest had

such an intent. Nothing in the record satisfies us that the defense could be maintained.

The question of abandonment of an application arises under section 4894 (page 3384), which provides that a failure to prosecute an application within two years after any action thereon shall be regarded as an abandonment of the application "unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable." In a proceeding under section 4915 the exception would mean "unless it be shown to the satisfaction of the Circuit Court having the matter in charge that such delay was unavoidable." Appellant insists that the delay for more than two years in the Circuit Court for the Western District of Pennsylvania was not unavoidable. To present such a contention collaterally constitutes a kind of attack upon the validity of the patent, which, for reasons already stated, cannot be permitted. The review of the question of abandonment of an application in Gandy v. Marble, 122 U. S. 432, 7 Sup. Ct. 1290, 30 L. Ed. 1223, was on a direct appeal in a proceeding under section 4915.

4. Prior practice, patents and publications are, quite elaborately discussed in Schmertz Wire-Glass Co. v. Pittsburgh Plate Glass Co. (C. C., W. D. Pa.) 168 Fed. 73; Schmertz Wire-Glass Co. v. Highland Glass Co. (C. C., W. D. Pa.) 178 Fed. 945; Highland Glass Co. v. Schmertz Wire-Glass Co. (3d Circuit) 178 Fed. 949, 102 C. C. A. 316; and in the opinion of the Circuit Court in the present cases, 178 Fed. 977.

Prior practice was of two kinds—single layer and double layer or "sandwich." Sandwich was the earlier. The first attempts consisted of putting into a mold a layer of molten glass, then the wire fabric, then another layer of molten glass, and subjecting the whole to pressure. When the roller process of making sheets of glass came in, the practice followed of rolling a layer of glass, putting upon it the wire fabric, and rolling thereon a top layer of glass. The single layer practice, dating from 1892, consisted in rolling a layer of glass, imbedding a wire mesh therein by means of a corrugated roller, and then pressing a smooth roller over the surface to close the furrows.

In Streator Cathedral Glass Co. v. Wire-Glass Co. (7th Circuit) 97 Fed. 950, 38 C. C. A. 573, wherein the Shuman patents were sustained, the published art relating to single-pour wire-glass is reviewed. As Schmertz's process and apparatus have to do with two-pour wire-glass, it is manifest that the single-pour method is neither anticipatory nor limiting.

Prior patents and publications respecting the sandwich method, passing for the moment British patent No. 1,715 of 1874 to Hyatt, are no more illuminative than the above-stated practice.

Before considering Hyatt, it may be well to have in mind the development of wire-glass in the world of industry and commerce. In the ante-Schmertz sandwich method there were three steps, separately taken. The cooling of the first layer before the sandwich could be finished prevented the making of large sheets. What small plates were made were apt to split at the fabric line. At most, the small panes were fit only for skylights and the like. Shuman turned his back on the sandwich method, and by his one-pour process made large

sheets that were clear and polishable, and therefore usuable in windows, elevator ways, partitions, and the like, where a fireproof, transparent (not merely translucent) wall was desired. This was the first real impress upon industry and commerce. In the Streator Case, supra, Mr. Justice Brown, speaking for the court, said that Shuman's "was evidently the first practicable method of making wire-glass, and appears to have attracted a good deal of attention in this and other countries, and various medals were awarded to the inventor." Shuman virtually put on the market a new product, because polished wire-glass of large size was theretofore unknown. Under his process plates aggregating 1,000,000 square feet were made and sold. But Shuman's glass was liable to have imperfections where the furrows made by the corrugated roller and by the wire mesh were smoothed over by the third roller. His glass acquired the sobriquet of "caramel." No wonder that the uniformly consistent Schmertz glass entirely superseded it upon the market. In eight years plates aggregating 31,000,000 square feet of Schmertz glass were put forth, and at the end of that time no Shuman glass was being made anywhere in the United States.

In the provisional specification of the Hyatt British patent appears the following:

"According to another part of my invention for making fireproof glass I make plate or rolled glass with a netting of wire incorporated in the body of the plate, one mode of doing this being as follows: I use two drums or rollers, as is done sometimes in making ornamental face glass, one behind the other. The former carries a wrap or web of wire netting, which as it rolls down the 'metal' is spread out upon the face of the flattened mass; but this 'metal' is only half of what is needed to make the sheet. Another dumping of another mass is made immediately upon the first flattened sheet with its overlaying of wire netting, the second mass falling upon the wire netting, where it is met by the second or following roller and flattened out, thus incorporating the wire sheet between two plates of glass welded together."

A table and two rollers are suggested, but no time relation is specified. The first roll is to constitute the wire-feed. If more than one turn of wire should be made on the roll, the apparatus would manifestly be inoperative. If one turn only is to be made, no method is shown for holding it in place. No wire-glass could be made of greater length than the circumference of the roll. One revolution of the roll would probably occur before the second pour could be made, and in that event the second roll would merely spread the top layer upon the completed bottom layer of a sandwich. We perceive in this no clear disclosure of the Schmertz process, wherein the combination of table, rolls, and independent wire-feed is used as a tool to form simultaneously and consistently the two pours and the wire into wire-glass, and wherein the tool is used progressively to complete a plate 10 or 12 feet long and 5 or 6 feet wide. But, at all events, Hyatt abandoned this proposal when he came to make his final specifications. Therein he took the method of holding the wire at a fixed distance above the face of the table so that one pour of molten glass would go through the mesh and then submerge the wire in the one body of glass. Of such a procedure Jessel, Master of the Rolls, said in Stoner v. Todd, L. R. 4 Ch. Div. 60, 46 L. J. Ch. 33:

"When we find in the final specification that in the description of one of the subordinate matters of the invention one of the details has been abandoned, that is a notification to the public that the inventor could not work it, or thought it useless, and has consequently omitted it altogether."

Hyatt's tentative suggestion, still-born and abandoned at birth, unknown, of course, to industry and commerce, lay unnoticed until defenses were sought in the various Schmertz litigations.

5. Schmertz was not a pioneer, as Morse and Howe and Bell were pioneers. Shuman's success with the one-pour method deprived Schmertz of taking the credit for introducing into commerce large-sized, polished, transparent wire-glass as a new product. Schmertz's product was simply better. The practice and publications regarding the three-step sandwich prevented Schmertz from claiming the sandwich method generically. But Schmertz was the first to conceive and devise a combination of a table, two rolls, and a wire-feed which could be used as a single tool to form simultaneously and consistently the two pours and the wire into wire-glass (particularly the new product, "wire-glass"), and which could be used progressively to complete the large plates that are demanded in modern buildings. With the defense of anticipation out of the way, we credit this achievement with displaying a high order of invention.

6. We have stated what we believe the record shows to have been Schmertz's real invention. Did he disclose and claim it in the reissued patent in such a way as to cover appellant's apparatus and method? Appellant manufactures in substantial conformity to the patent to Jungers, No. 867,510, October 1, 1907. Claim 1 is a sufficient explanation of the process:

"The process of making glass having a fire-resisting material incorporated therein, which consists in concurrently forming upon a substantially horizontal support two layers of glass, one upon the other and formed in successive order, and simultaneously paying out under tension and positively and continuously directing into the relatively progressing line of juncture between the finished upper surface of the first layer and the advance meeting portion of the second layer, a fire-resisting reinforcement, said reinforcement being held free from contact with either body of glass until overflowed by the relatively advancing edge of the second layer."

The apparatus embraces a table, two rolls, and a post-roll chute in connection with which are tension rolls that exert a 12 to 15 pounds resistance to the pull of the glass upon the wire and spreading rolls that spread out the mesh against the elongating pull of the tension rolls.

In the reissued patent the particular mechanism there disclosed only embraced a pre-roll wire-feed. If claim 1 be read only in view of the one sort of wire-feed described in that specification, and if stress be confined to shutting the word "simultaneously" by a comma into a place where it applies only to the joint action of the pre-roll feed and the first roll, the invention we have portrayed would not be covered. Quite true it is, in the case of the pre-roll feed, that if "simultaneously" be limited to absolute synchronism, to the concurrence of two actions without even an infinitesimal fraction of time intervening, the only synchronism is in the spreading of the first pour and the laying of the wire. But how did Schmertz word the matter in claims 6 and

7 of the reissued patent, claims asserted by him in the original patent as well, claims drawn by him, not by the Patent Office? He said that the process "consists in rolling a sheet of glass of less thickness than the ultimate product required; simultaneously forcing wire upon said sheet and forming a second sheet of glass upon the first sheet." If regard be given only to the semicolon and the unpunctuated joinder of the laying of the wire with the formation of the second sheet, Schmertz would be made to claim a synchronism that would be absolutely impossible if he were limiting himself to a pre-roll feed. But when claims 6 and 7 are read in connection with the specification, and the whole viewed in the light of the prior art, we think it clear that Schmertz was claiming the "simultaneous" formation of the two pours and the wire "progressively" into a consistent plate of wire-glass.

It seems equally clear to us that the Patent Office must so have understood Schmertz. These very claims, 6 and 7, were put into interference with Appert's and his own concurrently pending application. This latter application exhibited a post-roll gravity feed; Appert's a pre-roll tension feed. Manifestly the common ground was what Appert called "the simultaneous formation of. the two layers with the fabric inclosed between them and the progressive formation of the complete product." So far as the Patent Office is concerned, we cannot but conclude that the interference issues (claims 1 and 2 of the reissue) were framed to cover this common ground. And the reissue itself gave notice of this position. The specification was amended to show that claims 1 and 2 were inserted to cover broadly the invention common to the three applications that had been in interference. By this reference the public was bound, in our judgment, to ascertain what in the light of the prior art was broadly the invention common to the three as disclosed in the interference proceedings,. just as the public is bound by a reference in a recorded deed to a partition suit for a supplemental description of the land conveyed.

Furthermore, one should expect the apparatus claim to be limited to a pre-roll feed, if the process claims were so limited. But claim 2 purports to cover a post-roll as fully as a pre-roll feed.

Appellant's apparatus and process we therefore adjudge to be infringements of claims 1, 2, 6, and 7 of the reissued patent.

Appellees' patent No. 791,217 can be awarded no larger standing than an improvement of the broad invention of the reissue. That, of course, does not preclude others from improving also the primary invention. Each of the claims of patent No. 791,217 is limited to a "by gravity" feed. The patent of Jungers employs a positive feed under both longitudinal and lateral tension. We cannot count this a colorable evasion of the gravity feed, for it does away with the possibility of a waviness in the laying of the wire which sometimes occurs with the gravity feed. And the fact that the last 15 or 18 inches of. the wire is free from tension should not be held to characterize the process under which sheets ten or more feet long are made. No feeding appliance could well follow the fabric clear inside of the machine.

7. The contention that the process claims are unpatentable subject-matter needs no review, we believe, beyond reference to Expanded

Metal Co. v. Bradford, 214 U. S. 366, 382-385, 29 Sup. Ct. 652, 53. L. Ed. 1034, and Streator Cathedral Glass Co. v. Wire-Glass Co., 97 Fed. 950, 955, 38 C. C. A. 573.

In cause No. 1,682 the decree is reversed, with the direction to dismiss the bill for want of equity. In cause No. 1,683 the decree is affirmed.