APPERT v. BROWNSVILLE PLATE GLASS CO.

SCHMERTZ v. APPERT.

(Circuit Court, W. D. Pennsylvania. September 30, 1904.)

No. 13.

1. PATENTS—SUIT TO COMPEL ISSUANCE.

A suit by an unsuccessful applicant to compel the issuance of a patent to him under Rev. St. § 4915 [U. S. Comp. St. 1901, p. 3392], is not an appeal from the proceedings in the Patent Office or the decision of the Court of Appeals of the District of Columbia, but is one of original equity jurisdiction.

2. SAME—PRIORITY OF INVENTION—EVIDENCE CONSIDERED.

Evidence considered, and *held* to establish the reduction to practice by Edmund C. Schmertz of the process of making wire glass covered by the Appert patent, No. 608,096, prior to the issuance of the French patent, for the invention to Appert, and to entitle Schmertz to patents on his rejected applications covering such process and apparatus for practicing the same as against Appert.

3. SAME—LACHES—DELAY IN MAKING APPLICATION.

Delay by an inventor in applying for a patent after he has reduced his invention to practice for the purpose of perfecting it, or testing its practical value, will not constitute an abandonment or laches which will

defeat his right to a patent where, from some unknown cause, it was not successful in operation, although it subsequently develops that the trouble was due to external causes not affecting the utility or successful working of the invention.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 108.]

In Equity.

J. Snowden Bell and Philip Mauro, for complainant.
Wm. L. Pierce, for respondents.

BUFFINGTON, District Judge.   In this case Leon Appert filed a bill against the Brownsville Plate Glass Company and Edmund C. Schmertz, charging infringement of letters patent No. 608,096, issued February 26, 1898, to him for the manufacture of glass with metallic netting embodied therein.   Subsequently Schmertz filed a cross-bill against Appert under the provisions of Rev. St. § 4915 [U. S. Comp St. 1901, p. 3392], to compel the issue of patents to the former upon his two applications for apparatus and process, respectively, for manufacturing wire glass.   Mr. Schmertz having died, the cross-bill was duly revived in favor of his administrator.   The controversy between Appert and Schmertz began in an interference in the Patent Office declared between the two applications of Schmertz here in question and one of Appert, on which the patent noted above was granted.   The examiner of interferences found reduction to practice by Schmertz in January, 1894, but that, as he had not been duly diligent, decided in favor of Appert.   The examiner in chief reversed this decision. and found in favor of Schmertz, carrying back the date of his complete conception of the invention to January 5, 1894, which was prior to January 12, 1894, the date of the issue of the French patent to Appert.   This latter day was held to constitute Appert's date in the interference contest; he having no testimony to show an earlier one, but relying on that of the issue of his French patent.   The commissioner also found in favor of Schmertz, carrying his date of invention back to a period covered by January 1–10, 1894.   The case was then carried to the Circuit Court of Appeals of the District of Columbia, which court reversed the action of the commissioner and awarded the patent in question to Appert.

Thereupon the latter brought this bill and the cross-bill was filed under the provisions of Rev. St. 4915   [U. S. Comp. St. 1901, p. 3392], which provides as follows:

'Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim. or for any part thereof, as the facts in the case may appear.   And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law.   In all cases where there is no opposing party, a copy of the bill shall be served on the commissioner; and all the expenses of the proceedings shall be paid by the applicant, whether the final decision is in his favor or not."

Under the authorities (Butterworth v. Hoe, 112 U. S. 50, 5 Sup. Ct. 25, 28 L. Ed. 656; Butler v. Shaw (C. C.) 21 Fed. 321; Wheaton v. Kendall (C. C.) 85 Fed. 671; Bernardin v. Northall (C. C.) 77 Fed. 849) the present case is not an appeal from the proceedings in the Patent Office, but one of original equity jurisdiction.

Moreover, we have in the record very considerable additional proofs to those advanced in the interference and considered by the Circuit Court of Appeals of the District of Columbia. Indeed, there is the affirmative testimony of some five additional witnesses to the reduction to practice, failure to call whom was adversely commented upon in that case. So, also, one of the two witnesses called by Appert in that case had not been cross-examined. Examination of them in this case by Schmertz's counsel has developed modifying facts. Appert and Schmertz seem to have been working at substantially the same period in developing the wire glass process; the former in France, the latter in America. It related to casting rough plate glass for skylight and other purposes, having a wire mesh embedded in its center. This had been done by what was known as the "European method," which consisted in first casting the lower part of the plate, then placing the wire mesh upon it, then casting the upper part thereon. The difficulty with that process was that the plate when finished consisted of two separate strata, the lower of which had so far congealed or solidified before the upper half was cast that the two would not unite and form a homogeneous whole. The result was they separated or split. Schmertz's invention consisted in a process, and means to apply the same whereby the operation which rolled the lower section of the plate to the desired thinness simultaneously deposited thereon the wire mesh. Immediately thereafter the top layer was poured and a roller followed, which reduced the sheet to the desired thickness. The speed of the operation was such that, instead of two separate plates or layers being pressed together, the two layers united to form a homogeneous whole. Schmertz testified that between June 1 and July 7, 1893, he made sketches of his invention on certain patent specifications he had been studying and which are in evidence; that between December 2d and 9th of the same year he made another sketch on a stock list made on December 2d; that about the same time he penciled certain memoranda below the sketch; that between January 1–10, 1894, he made another sketch upon a trial balance made January 1, 1894. He testified he made another sketch on an envelope containing a certain freight bill on the day of its receipt, which is shown to have been January 6, 1894. These sketches are all testified to by him, and while not minute in details they are in line with the apparatus used by him on January 16, 1894, to demonstrate the process and which different witnesses testify to having seen operated. We see nothing in the case to discredit the testimony of Schmertz as to these sketches. The very fact that they were made on patents, stock list, trial balance, envelope, things which would seem to have been at hand, shows a naturalness and absence of design that strongly tend to warrant belief in their authenticity. Moreover, the witness gives facts of more or less corroborative effect fixing the dates.

It will also be borne in mind that the practical use of the process on January 16, 1894, which is clearly shown, is in accord with these sketches. As a large roll was brought from a distance to the works specially for that purpose and was turned to shape to enable it to be used therefor, it is hardly possible to believe that such steps would have been taken without a reasonably clear conception of what was intended to be done. And, if there was then, as we shall see was the fact, a clear conception of the process and of the apparatus to employ it, it is quite natural that such conception should have been embodied in prior sketches. The process was tried on January 16, 1894, was witnessed by numerous persons, and certain documentary evidence, in the way of telegram, freight, and roll-turning bill, fixes the date and fact that on January 6, 1894, a large roll was sent from Brownsville to another factory at Pittsburgh, was turned down so as to fit it for use in the process in question, and was shipped and delivered to the New Kensington factory, where the process was used, reaching there on January 10, 1894. Swearer, who was manager of that factory, says Schmertz, who was the principal officer of the company owning it, in the early part of July, 1893, explained the process to him by sketches, and that it was discussed by them for five or six months before it was tried. He fixes having seen the sketch on the trial balance sheet the early part of January, 1894, by reason of the fact that he knows it was just before his visit to a glass factory at Tacony, which was on January 10th. He also says that at this conversation Schmertz told him he intended to get a roll from Brownsville. As Schmertz telegraphed to Brownsville on January 5, 1894, and as the permit to Swearer through the Tacony factory is dated January 11, 1894, and telegrams to his son show he was in Philadelphia on that day, we think the testimony of Swearer that he saw the trial balance sketch at least as early as January 10th is undoubted. He also testifies to Schmertz's use of the process at the New Kensington factory from January 16 to 20, 1894. He says they continued making glass by this process during that year, except when the factory was shut down March 7th to May 7th. Some of the glass was satisfactory, and some not. In this connection, and as bearing on the question of due diligence in perfecting the invention, it will be noted that the proofs show that the failure to obtain perfect glass in all cases at that time was not attributable to the casting process, but to the use of material, and that the damage was done in annealing, a later and distinct operation. This was clearly shown in the testimony of Swearer, which we quote at length:

"Q. 47. Now, when you commenced to make wire glass by the methods described in my last question, in January, 1894, did you experience any loss of glass? A. Yes; we had a great deal of trouble. We were able to embed the wire screen right away, substantially in the middle of the sheet, and we were able to properly weld the top and bottom sheets together, almost immediately; but our troubles came when the glass was passed through the kiln. When we came to remove the glass from the kiln, after it had laid there annealing for three or four days, we frequently found that large quantities of it were broken. This condition continued to be serious for almost a year, and interfered with our putting product on the market. We finally found out what the trouble was. It was not with the method, nor with the apparatus, but was due to the fact that the top and bottom sheets were ladled out

of different pots. The ladling had to be done practically simultaneously for both the top and bottom halves of the sheet, because the second half was formed so quickly after the first was started. Now, if we had put both sets of ladlers on one and the same pot, they would have interfered with each other, as both would have wished to be dipping into the pot at the same time. Accordingly we sent one set of ladlers to a pot on one side of the furnace, and the other set of ladlers to a pot on the opposite side of the furnace. Now, unless unusual care is taken, the glass in two pots is not likely to be refined in the same degree. One pot may be exposed to more heat than the other pot; and, if they have been melting for the same time, the contents of one pot would not be so well refined as the contents of the more highly heated pot. It will be seen that if the contents of pot A are used to make the lower half of the sheet, while the contents of pot B were used to make the upper half of the sheet, they may be perfectly welded together before they have passed into the kiln, but after they are in the kiln the different quality of the glass in the top sheet from the glass in the bottom sheet would cause the glass on the top half to shrink unevenly as compared with the bottom half. This would not break the weld between the two halves, but would start up cracks running through the sheet in various directions. We had the same difficulty where we made integral glass sheets, but which were of such size that they required to be rolled in two different parts. This trouble was obviously due to the condition of the glass in our pots, and not to our casting and rolling method. As I have said before, we did not discover, for a long time, what occasioned the breakage of these sheets in the kiln, and only got the same even relatively cured about a year after we started."

Hutchinson, a bookkeeper in the city office of the company, says Schmertz explained the process to him prior to July 8, 1893, and that he repeated Schmertz's account to a man at the factory at Brownsville, where he went to take stock on that day, fixing the date by this fact. He also testifies to having seen the sketches on the back of the Shuman patent prior to October 1, 1893, and, though he gave no incident connecting that date with seeing the patent, no effort was made on cross-examination to question his statement in that regard. Toynbee, a ladler, testified to the making of merchantable glass by the process on January 16th. While there were about a dozen men employed in this work, and only six have been called, it is shown by this witness that such laborers are usually foreigners, who are ignorant and drifting from place to place, and their testimony could not be obtained. Cumulative proof as to the use of Schmertz's process from the time it was started at New Kensington is also given by Adams, a roller, Sigl, a ladler, Sullivan, an annealer, McGahan, who worked at both rolling and annealing, and Speer, a roller. In view of these proofs, we are justified in finding, as we do, that Schmertz employed his process successfully in the making of wire glass at the New Kensington factory on January 16, 1894, and thereafter. Appert's French patent having issued January 12, 1894, that day is to be regarded for the purpose of this case as his date of invention. De Farranti v. Westinghouse, 52 O. G. 457; Appert v. Parker, 70 O. G. 1587; American Bell Telephone Company v. Cushman (C. C.) 57 Fed. 842; 65 O. G. 135. In this view of the case it is not necessary to carry the Schmertz conception and efforts to reduce to practice back to those preceding January, 1894; for, if the sketch on the trial balance sheet disclosed the invention, if it was made prior to January 12th, and was accompanied by sufficient efforts to reduce to practice, such facts will award Schmertz priority over Appert's date of January 12th. The drawing

made by Schmertz on the trial balance sheet to our mind sufficiently discloses the process and apparatus, and would convey to those versed in the art the nature of such process and of the apparatus to use it. Swearer, the manager, testifies to having seen it before he went to Philadelphia on January 10th, of which date there can be no dispute in view of the corroborative proof of the pass to visit the works there and his telegrams home. That Schmertz was contemplating a prompt ·eduction to practice we cannot doubt, for his telegraphing to Brownsville for the roll, having it so promptly turned down and shipped to New Kensington, shows unusual alertness in following up his conception by practical trial.

From these proofs, in connection with the corroboration of the workmen employed, we are of the opinion that early in January, and prior to the 10th, Schmertz had a clear, well-defined conception of the process and apparatus in question; that he embodied the same in a sketch fully intelligible to those versed in the art; that he disclosed the sketch and process to Swearer; that he was then actively attempting to reduce it to practice by assembling and having the necessary apparatus prepared; and that he reduced the same to practice on January 16th and 17th, and continued the same thereafter. His conduct subsequently shows no abandonment of the invention or laches in perfecting it mechanically. It appears that while merchantable glass was made from the start that part of the product was unmerchantable. The manufacture, however, was continued, and after much effort and considerable time the difficulty was located, as we have seen by the testimony of Swearer. Such difficulty proved to be not the fault of the process or the apparatus devised to practice it, but lay wholly in the preparation and use of molten glass of dissimilar character for both upper and lower layers. In view of these latent difficulties, which only persistent practice located and removed, we think there was no improper delay of Schmertz in applying for his patents. We think these difficulties were such that an inventor might well take time to make further tests of the practical value of his invention before applying for a patent. And, if meanwhile he is persistently pursuing such efforts, there is no abandonment. Indeed, "the law encourages such delay as is required to test the thoroughness and utility of supposed inventions, and prevent the Patent Office from being overloaded with applications for crude and incomplete devices." Griffin v. Swensen, 89 O. G. 919. Whether, indeed, the demonstrations of January 16 and 17, 1894, were not themselves self-sufficient as showing a practical reduction to practice (See National Co. v. Lamson Company [C. C.] 60 Fed. 603) may well be contended; but, as we have seen, the law will not compel an inventor at his peril to take immediate steps to patent and thus force him to forego the benefit of further tests.

Under all the proofs we are of opinion the prayer of the cross-bill should be sustained.